UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA KENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 09-CV-6580 |
| THE CITY OF CHICAGO, | ) | |
| | ) | Judge John W. Darrah |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Angela Kent brings suit against her former employer, Defendant City of

Chicago (the "City"). Before the Court is the City's Motion for Summary Judgment.

Kent filed a Second Amended Complaint on April 12, 2010, alleging a violation of the

Equal Pay Act, 29 U.S.C. § 206(d) ("EPA") (Count I), and violations of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") based on sex discrimination

(Count II) and race discrimination (Count III). Kent filed her original Complaint on

October 19, 2009, and filed an Amended Complaint on January 25, 2010; both

Complaints also alleged violations of Sections 1981 and 1983. On February 4, 2010, the

City of Chicago filed a motion to dismiss Kent's Section 1981 and 1983 claims pursuant

to Fed. R. Civ. P. 12(b)(6) and to dismiss as untimely any Title VII claims that occurred

before December 11, 2007. After full briefing on the City of Chicago's Motion to

Dismiss First Amended Complaint in Part, the Court granted the City's Motion to Dismiss Kent's Section 1981 and 1983 claims and dismissed any Title VII claims that occurred before December 11, 2007, as untimely. (*See* Dkt. Nos. 28-29.) Kent was granted leave to file a second amended complaint. On February 4, 2011, the City of Chicago filed a Motion for Summary Judgment; the Motion has been fully briefed and is ripe for ruling.

## BACKGROUND

The following facts are taken from the Parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[1]

Angela Kent is an African-American female who was employed by the City of Chicago's Department of Streets and Sanitation (the "Department") from October 2, 2000 to April 15, 2008. (Def.'s 56.1(a)(3) ¶ 3.) On October 8, 2009, Kent filed a charge against the Department with the Equal Employment Opportunity Commission ("EEOC"), alleging a violation of the Equal Pay Act and race and gender discrimination. (*Id.* ¶ 4.) Kent received a Notice of Right to Sue on December 30, 2009. (Pl.'s 56.1(b)(3) ¶ 5.)

---

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

*The Department of Streets and Sanitation — Titles and Salary Structure*

The Department is comprised of seven bureaus: Sanitation, Forestry, Electricity, Traffic Services, Rodent Control, Street Operations, and Administration. (Def.'s 56.1(a)(3) ¶ 7.) The Department is headed by a Commissioner, with a First Deputy Commissioner and Deputy Commissioner, in this order, answering to the Commissioner. (*Id.* ¶ 8.) Beneath the Deputy Commissioner, the Department has numerous other positions in its hierarchy, including Assistant Commissioners, Project Administrators, Assistant General Superintendents, and Staff Assistants, in that hierarchical order, among others. (*Id.* ¶ 8.)

The City uses two different job categorizations: "graded" and "special rate." (*Id.* ¶ 10-11.) For example, the Assistant General Superintendent and Staff Assistant titles are "graded" positions that follow a salary schedule. (*Id.* ¶ 10.) The employee's assigned title determines the "grade." (*See Id.* ¶ 11.) If the position is "graded," the City's salary resolution identifies (1) the specific salary schedule to use and (2) the grade to apply on the identified salary schedule. (*Id.*) One such schedule that is relevant to this case is "Schedule B" (the "Salary Resolution"). (Pl.'s 56.1(b)(3)(C) ¶ 23.) The grades on the Salary Resolution range from 1 to 21. (*Id.*) Within each grade, the salary schedule for a graded position contains an entrance rate, intermediate rate and a top rate of pay, which are referred to as "steps." (Def.'s 56.1(a)(3) ¶ 11.) An employee that is assigned to a given grade may advance to steps within that grade. (*See id.*) Steps are determined by continuity of service and length of time in a given step. (*Id.* ¶ 12.)

3

The Projects Administrator position is a "special-rate" position not subject to a salary schedule — special-rate positions are usually senior management positions within the City. (*Id.* ¶ 12.) While a special-rate position has a budgeted salary based on the job description for the title, a department head may request to pay the employee more or less than the budgeted amount. (*Id.* ¶ 13.) When determining if a special-rate employee will receive a higher salary than the listed budgeted salary, some of the factors considered are the employee's education, experience, training over the minimum qualifications specified for the class, and continuous service with the City, among other factors. (*Id.*) Actual job duties are not a factor in determining salary. (*Id.*) An employee that is appointed is paid at a rate that will provide an increase in salary of approximately five percent over the last salary that was paid to the employee. (*Id.* ¶ 14.)

The City has a policy in place for departments to request the Department of Human Resources ("DHR") to perform a desk audit on an employee (the "incumbent") in a titled (e.g., graded) position. (*Id.* ¶ 15, 19.) A desk audit may be performed to determine if a titled position is correctly classified, meaning that the work performed matches the job description and salary. (*Id.* ¶ 16; Pl.'s 56.1(b)(3) ¶ 16.) A desk audit may be completed whether the titled position is vacant or if it is filled by an incumbent. (Def.'s 56.1(a)(3) ¶ 16.) If the position is filled, DHR requests that the incumbent complete a position description questionnaire. (*Id.*) The questionnaire is reviewed by the incumbent's supervisor as well as the department head, who must sign off on it. (*Id.* ¶ 17.) A DHR Analyst reviews the questionnaire, reviews a department organizational chart, and interviews the incumbent and the supervisor about the job

4

duties. (*Id.*) The Analyst also looks to comparable positions within the City that have similar duties and responsibilities to determine if the incumbent's position is properly classified. (*Id.* ¶ 18.) The Analyst then makes a recommendation on what the employee's classification should be, and the recommendation is sent to the operating department. (*Id.* ¶ 18.)

If a title is not included in a City department's budget, then it does not exist and there is no salaried position. (*Id.* ¶ 23.) The title of "hearing officer" is neither a titled nor a budgeted position in the Department. (*Id.*) While a Department employee handles hearing officer responsibilities, these duties are assigned to an employee who already has a titled position within the Department. (*Id.*) The hearing officer assignment for the Department is not accompanied by a salary increase or a new title. (*Id.*) Generally, hearing officer duties for the Department consist of receiving disciplinary requests from managers in the field who seek to impose discipline on an employee. (*Id.* ¶ 24.) In addition, hearing officer tasks include contacting the applicable union, scheduling the hearing, conducting the hearings, and then following up to verify that discipline was served. (*Id.* ¶ 24.)

*Kent's City Employment*

Kent was hired by the City on October 2, 2000, as a Staff Assistant within the Bureau of Traffic Services; and her salary was based on the Salary Resolution's grade assigned to her titled position. (*Id.* ¶ 25; Kent. Dep. at 12:9-10.) At the time, the starting salary for a Staff Assistant was based on Schedule B, Grade 13, step 1 of the 2000 Salary Resolution. (Def.'s 56.1(a)(30 ¶ 25.) Starting in 2000, Kent's duties as a Staff Assistant

included administrative work, answering telephone calls, scheduling meetings, taking notes, and providing computer training to employees returning from medical leave. (*Id.* ¶ 26.) Sometime in late 2004 or early 2005, Kent began working for Mike Dacanay in the Bureau of Electricity. (Def.'s Resp. to Pl.'s 56.1(b)(3)(C) ¶ 3; Kent Dep. 13:9-10.) Six months later, Catherine Hennessy ("Hennessy") told Kent that she would be taking over the disciplinary hearing duties of John Horodecki ("Horodecki"). (Def.'s Resp. to Pl.'s 56.1(b)(3)(C) ¶ 3.)

On February 28, 2006, Hennessy released a memorandum, dated February 28, 2006, to all deputies and supervisory personnel, stating in part, "[p]lease be advised that effective Friday, March 3, 2006, Angela Kent will be taking over the job responsibilities of the Department's hearing officer. John Horodecki has taken on a new assignment in the Commissioner's office. . . ." (Pl.'s 56.1(b)(3) ¶ 26; Def.'s Resp. to Pl.'s 56.1(b)(3) ¶ 4.) Kent was assigned the Department's hearing officer duties around the time of the 2/28/06 memorandum and also assumed Violence in the Workplace ("VITW") liaison duties. (Def.'s 56.1(a)(3) ¶ 27; Def.'s Resp. to Pl.'s 56.1(b)(3) ¶ 3.)

Shortly after her assignment to the hearing officer duties, Kent spoke with Hennessy about a salary increase. (*Id.* ¶ 34.) Hennessy told Kent that the Department did not have the budget to increase her salary but that Kent would "eventually" receive a raise. (*Id.*) Hennessy told Kent that she would put in a request for a desk audit to assess what Kent's job title should be. (*Id.*) On or around July 19, 2006, the Department requested that DHR perform a desk audit on Kent. (*Id.*)

In her desk-audit questionnaire, Kent specifically requested the titled position of Project Coordinator, which corresponds to a Schedule B, Grade 15 position. (*Id.* ¶ 35.) The DHR Analyst who assessed Kent's desk audit did not agree that a Project Coordinator was the appropriate titled position for an employee who presides over hearings, because a Project Coordinator "typically serves as a project or program supervisor, overseeing staff and work operations to ensure established goals and objectives of the department are met" and that did not describe Kent's duties. (*Id.*) The Analyst concluded that Kent's duties were more similar to that of an Administrative Services Officer II ("ASO II"). (Sangster Aff. ¶ 13; Pl.'s 56.1(b)(3) ¶ 35.) At the conclusion of DHR's 2006 desk audit, Assistant Commissioner Vanessa Quail informed Kent that the Department did not have a budgeted line item for the ASO II position. (Pl.'s 56.1(b)(3) ¶ 35.) Deputy Commissioner Robert Richardson also informed Kent that the Department did not have the budget to increase her pay step. (Def.'s 56.1(a)(3) ¶ 36.) Richardson told Kent that if the Department "got any money or the money situation changed, then [Kent] would be one of the first ones that [the Department] would promote." (*Id.*) On July 13, 2007, Kent requested a second desk audit; however, the parties dispute whether a second desk audit took place. Kent testified that after she sent the July 13, 2007 email, Deputy Commissioner Robert Richardson said to Kent, "[The Department] didn't have money and don't send Vanessa [Quail] any more e-mails." (Pl.'s 56.1(b)(3) ¶ 15.)

On April 16, 2008, Kent assumed the position of Superintendent of Special Traffic Services in the Office of Emergency Management and Communications. (Def.'s

56.1(a)(3) ¶ 38.) In this new position, Kent received a new titled position, an increase in salary, and supervisory authority over Traffic Control Aides. (*Id.*) During Kent's eight-year employment with the City, she received twelve increases in her salary. (*Id.* ¶ 39.) These increases included scheduled step increases pursuant to the City's Salary Resolution, cost-of-living adjustments, and a salary increase she received on April 16, 2008. (Pl.'s 56.1(b)(3) ¶ 16.)

*John Horodecki's City Employment*

Horodecki worked for the City from December 8, 1976 to 1987. (Def.'s 56.1(a)(3).) He worked in the following City departments: Chicago Police Department; Planning and Development; and Streets and Sanitation. (Def.'s 56.1(a)(3) ¶ 40.) He was promoted to four different positions from 1976 through 1987. (*Id.* ¶ 40.) In 1987, Horodecki resigned from the City; but in 1993, he was rehired as a Deputy Director in the Mayor's Office of Inquiry and Information as a Deputy Director. (*Id.*) The Deputy Director position is a special-rate position. (*Id.*) On January 15, 1998, Horodecki was promoted to the position of Projects Administrator with the Department, which is also a special-rate position. (*Id.* ¶ 41.) Horodecki's salary for the Projects Administrator started with the budgeted rate that the Department had allotted for the Projects Administrator position. (*Id.* ¶ 42.) Pursuant to the Department's policy, because Horodecki's previous salary as a Deputy Director was higher than the budgeted rate for the Projects Administrator position, Horodecki received a five percent raise above his Deputy Director salary. (*Id.* ¶ 13-14, 42.)

Within his first year as Projects Administrator, Horodecki's duties included traveling to City wards, observing the supervisors, and then making recommendations to the Department's Commissioner regarding moving the supervisors to new assignments. (*Id.* ¶ 43.) In or around 1999, Horodecki was assigned the additional duty of the Department's hearing officer to clear up the back log of hearings. (*Id.* ¶ 44.) Horodecki's title did not change after he received the hearing officer duties; he received an increase in his salary for cost-of-living adjustments. (*Id.*) The cost of living adjustments are given to all City employees. (*Id.*)

From 1999 to 2008 (when Kent assumed Horodecki's hearing officer duties), Horodecki had additional duties apart from his hearing officer duties. (*Id.* ¶ 64.) In addition to Horodecki's hearing officer duties, his duties included serving as a first responder, working the snow program as a street supervisor, and investigating employees on duty disability to determine if they were really injured. (Def.'s 56.1(a)(3) ¶ 45.) Some of these duties required Horodecki to either work or be on-call twenty-four hours a day, seven days a week. (*Id.* ¶ 46.) Furthermore, Horodecki reported directly to the Commissioner, who may call on Horodecki if he had any additional duties that he needed Horodecki to complete. (*Id.* ¶ 46.) When the Commissioner called and needed Horodecki to perform an additional task, Horodecki testified that he would cease presiding over the Department's hearings until he completed the assigned task. (*Id.* ¶ 47.) For example, if it was snowing, Horodecki would postpone hearings and turn his attention to managing snow removal. (Def.'s Resp. to Pl.'s 56.1(b)(3)(C) ¶ 18.)

On February 28, 2006, after Kent assumed Horodecki's hearing officer duties, Horodecki remained a Projects Administrator; but he was assigned to the construction section, where he inspected buildings under construction and issued citations to buildings that were in violation of the building code. (Def.'s 56.1(a)(3) ¶ 51.) Horodecki's salary did not change when he was relieved of his hearing officer duties and assigned to the construction section. (*Id.* ¶ 52.) Horodecki remained in the construction section as a Projects Administrator until he was terminated due to a reduction-in-force. (*Id.*)

*Richard Bradley's City Employment*

Richard Bradley ("Bradley")[2] began working for the City on December 1, 1977, in the Department of Human Services. (*Id.* ¶ 53.) From 1977 until 1997, Bradley was continuously employed by the City and worked in three City departments, as well as the City Clerk's office. (*Id.* ¶ 54.) In 1997, Bradley was promoted from Deputy Director in the Mayor's Office of Inquiry and Information (a special-rate position) to the position of Assistant General Superintendent with the Department (a Schedule B, Grade 17 position). (*Id.* ¶ 55-56.) As a Schedule B, Grade 17 position, the Assistant General Superintendent position paid less than Bradley's former Deputy Director position. (*Id.* ¶ 57.) Although Bradley could not start at a higher grade than a Schedule B, Grade 17 position, which was set by the salary schedule for the Assistant General Superintendent title, his length of service and continuous service put him at a higher pay step within the Schedule B, Grade 17 pay grade. (*Id.*) Therefore, Bradley's twenty years of continuous City service prior to

---

[2] Although Bradley is not a valid comparator for the reasons set forth below, the limited evidence relating to Bradley's employment is recited nonetheless. It is noted that the only evidence relating to Bradley's employment is an affidavit submitted by the City. It appears that Bradley was not deposed.

his appointment to Assistant General Superintendent resulted in a ten percent raise over his Deputy Director salary. (*Id.*) Like any other graded position, Bradley was eligible for future scheduled salary adjustments if he provided satisfactory service and continued working in the graded Assistant General Superintendent position. (*Id.*)

As Assistant General Superintendent, Bradley's duties included supervising the summer youth program; handling special projects by the Commissioner, such as planning and organizing the Department's resources and manpower for City events, parades, marathons, and other public events; setting up and then supervising the City-wide Street Sweeping Aides program; being on-call for the City's snow program that lasts from approximately December 1st through April 1st and includes being one of the Department's supervisors on the street to ensure that the snow is cleared from the streets and sidewalks; handling day-to-day complaints called in by citizens, including for garbage or recycling not being picked up or trees that fell; and any other duties or assignments that the Deputy Commissioner of Sanitation assigned him. (*Id.* ¶ 58.)

Around the middle of 2008, after Kent left her position, Bradley was also assigned the hearing officer duties for the Department. (*Id.* ¶ 59.) Bradley did not receive additional pay when he was assigned the hearing officer duties, nor did his title change. (*Id.*) As an Assistant General Superintendent in the Bureau of Sanitation, Bradley reported directly to the General Superintendent or the Deputy Commissioner of Sanitation. (*Id.* ¶ 60.) Bradley held the hearing officer duties, along with his other job duties, until approximately one month before he retired on July 1, 2010. (*Id.* ¶ 61.)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal citation omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## ANALYSIS

### Count I (Equal Pay Act)

To establish a *prima facie* case for a violation of the EPA, a plaintiff must demonstrate that: (1) different wages are paid to employees of the opposite sex; (2) the employees do equal work that requires equal skill, effort, and responsibility; and (3) the employees have similar working conditions. *Markel v. Board of Regents of the Univ. of Wisconsin Sys.*, 276 F.3d 906, 912-13 (7th Cir. 2002) (*Markel* ). The jobs that are

compared must be substantially equal, based on actual job content and performance—not job titles, descriptions, or classifications. *Markel,* 276 F.3d at 913. The terms "equal skill, effort, and responsibility" constitute separate tests, each of which must be met to establish a *prima facie* case. *Stopka v. Alliance of America Insurers,* 141 F.3d 681, 686 (7th Cir. 1998) (*Stopka*). A plaintiff's job would be considered substantially similar where her job and those of her comparators involved a common core of tasks or a significant portion of the jobs is identical. *Stopka,* 141 F.3d at 685 (citing *Fallon v. Illinois,* 882 F.2d 1206, 1209 (7th Cir. 1989) (internal quotations omitted)).

The City argues that Kent has not established the second or third element of her *prima facie* case. Kent argues that there is a triable issue of fact with respect to the second and third elements. For the reasons set forth below, the City's motion for summary judgment is granted with respect to Kent's EPA claim (Count I). As an initial matter, the parties dispute the application of the statute of limitations to Kent's EPA claims. This issue is not reached because summary judgment is granted in favor of the City.

## Valid Comparators

As a threshold matter, the parties dispute which employees may be considered Kent's "comparators" for purposes of evaluating her EPA claim. In Kent's response to the City's summary judgment motion, Kent puts forth, for the first time, a new comparator, Richard Bradley. (Pl.'s Resp. at 4; Pl.'s 56.1(b)(3) ¶ 6.) The City properly argues that Kent cannot amend her complaint through arguments in her brief opposing

summary judgment. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") Kent did not identify Bradley in her Second Amended Complaint (or any of her complaints, for that matter). Nor did she identify Bradley in her answers to the City's interrogatories or her Rule 26(f) disclosures. Kent's Second Amended Complaint specifically compares her salary to Horodecki's or her male predecessor's (Compl. ¶¶ 6, 9-16, 22, 25, 28) — Bradley was Kent's successor so any references to a predecessor could not refer to Bradley. (*See* Pl.'s Resp. at 1, 4.)

Furthermore, it cannot be said that Kent provided notice to the City through the discovery process that she intended to use Bradley as a comparator. *Compare Cole v. Lexington-Richland School Dist. 5*, No. 3:09-1301, 2011 WL 441974, at *4 (D.S.C. Feb. 8, 2011) (holding that although plaintiff's complaint did not refer to more than one comparator, because plaintiff developed evidence of other comparators through the discovery process and provided defendant with a list of comparators, the defendant had fair notice of additional comparators). Upon review of the record, it appears that the first time Kent referred to Bradley was during Kent's deposition when she testified that a male who was assigned the hearing officer duties after she left made "[m]ore than $20,000" than Kent (Def.'s 56.1(a)(3) ¶ 67); but Kent could not remember this male's name. Kent did not develop adequate evidence of Bradley as a comparator. Bradley was not deposed and the three paragraphs of Kent's Rule 56.1(b)(3) statement that reference Bradley lack foundation, are speculative, and are unsupported by the record. (*See* Pl.'s 56.1(b)(3)(C) ¶ 21, 22, 33.) *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000)

("[C]onclusory statements, indications of opinion, or speculation [] do not produce a genuine issue for trial under Rule 56(c)."). In the factual record before the Court, the only evidence relating to Bradley's employment consists of an affidavit submitted by the City.

Due to Kent's failure to adequately reference Bradley as a comparator prior to filing her response brief, Bradley is not a valid comparator. *See Snider v. Belvidere Township*, 216 F.3d 616, 618 (7th Cir. 2000) ("[O]ur review of [plaintiff's] Complaint shows that nowhere in Counts I and II does she even reference Jerome Witek's pay, let alone complain that it violates the Equal Pay Act. There being no timely claim with regard to Witek, then, we do not consider the evidence regarding his wages."). But, as discussed below, even if the Court were to consider Bradley as an additional comparator, the outcome would not change.

### *Prima Facie* Case Regarding her EPA Claim

Now, turning to Kent's *prima facie* case, the parties do not dispute Horodecki received different wages than Kent. *See Markel*, 276 F.3d at 912-13.[3] With respect to the second element, the City has demonstrated that Kent cannot establish that she and Horodecki did "equal work that requires equal skill, effort, and responsibility." *Id.* Kent has failed to discharge her burden, however, by pointing to evidence regarding the equality of her job to Horodecki's (or Bradley's).

---

[3] If the Court were to consider Bradley a valid comparator, Kent has not pointed to evidence that Bradley was paid a higher salary than she. It could be presumed from the fact that Bradley was employed at a higher grade than Kent on Schedule B, but Kent has not actually produced any evidence that such is the case.

The undisputed facts establish that Horodecki and Kent both, at one time, though not overlapping time periods, had hearing officer and VITW liaison officer duties. (Pl.'s Resp. to Def.'s 56.1(a)(3) ¶ 27; Def.'s 56.1(a)(3) ¶ 45.) However, Kent does not dispute that, when Horodecki had hearing officer duties, Horodecki's position entailed several additional duties, including: "investigating sexual harassment complaints and collecting responsive information; working with the Inspector General's office when complaints were referred to the Department; working as a first responder at the 911 center if there were any major catastrophes or emergencies in the City; working the snow program as a street supervisor to ensure that the streets were cleared of snow after snowstorms; and investigating employees on duty disability to determine if they really were injured." (Def.'s 56.1(a)(3) ¶ 45; Pl.'s Resp. to Def.'s 56.1(a)(3) ¶ 45.) Furthermore, several of Horodecki's duties, such as serving as a first responder, working the snow program, and investigating employees on duty disability, required Horodecki to work or be on call.[4] (Def.'s 56.1(a)(3) ¶ 45.) Thus, Horodecki was responsible for these duties as well as his hearing officer and VITW duties. In addition, as the Projects Administrator, Horodecki reported directly to the Commissioner, who assigned him additional ad hoc tasks. (Id. ¶ 11, 45.)

Kent does not dispute that she did not report directly to the Commissioner or Deputy Commissioner of the Department. But Kent argues that that she also performed duties in addition to her hearing officer duties. In support, she submits a declaration in

---

[4] Kent disputes that there is no indication in the record of how many days of the year Horodecki was on call. However, Kent does not dispute that Horodecki was on call for these duties.

which she states:  she "served as a first responder during emergencies and conducted duty disability investigations," "performed prehearing investigations," "overturned decisions previously made," "reconstituted the office's core responsibilities," "met with unions and heard grievances," and took "on other tasks required by the Department." (Pl.'s 56.1(b)(3), Ex. B ("Kent Declaration").)  Kent's Declaration, however, contradicts her sworn deposition testimony and certified interrogatory answers.  As the City points out, some of Kent's additional job duties match verbatim the job duties that Horodecki testified that he performed in his December 10, 2010 deposition.

It is axiomatic a "party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001); *see also Darnell v. Target*, 16 F.3d 174, 177 (7th Cir. 1994) (noting that an affidavit which is contradicted by the affiant's deposition testimony is "without factual support in the record . . . and cannot defeat a motion for summary judgment").  In cases of contradiction, an affidavit must be disregarded in favor of deposition testimony "unless it is demonstrable that the statement in the deposition was mistaken perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532-33 (7th Cir. 1999) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)).

Kent testified at her deposition that her job duties included:  receiving the proposed discipline; scheduling a hearing; meeting with the union representative, the

17

supervisor, and the employee; allowing all the parties to explain what happened; making a decision regarding the appropriate amount of discipline; writing up her decision; and then updating the information in her disciplinary database. (Def.'s Resp. ¶ 6.) All of these duties relate to acting as a hearing officer or a VITW liaison officer. None of these duties compare to Horodecki's additional duties, discussed above. Further, Kent's response to City's Interrogatory No. 4, which requested her to identify her work duties as a hearing officer, did not include any of the additional duties she lists in her Declaration. (Def.'s Resp. to Pl.'s 56.1(b)(3); Def.'s 56.1(a)(3) Ex. L.) In her deposition, the City asked Kent on two separate occasions whether she had any additional hearing officer duties, and each time she answered, "no." (*Id.*) Kent's last-minute affidavit appears to be an attempt at manufacturing a disputed issue of fact, and such attempts run contrary to well-established case law regarding what evidence may be considered in the context of summary judgment. Therefore, the undisputed facts demonstrate that Kent did not have any duties apart from her hearing officer and violence-in-the-workplace duties. (Def.'s 56.1(a)(3) ¶ 27.)

Kent has not established that the work she and Horodecki performed required "equal skill, effort, and responsibilities." *Markel*, 276 F.3d at 913. Nor has she established that their duties "involved a common core of tasks or a significant portion of the jobs is identical." *Stopka*, 141 F.3d at 685 (citing *Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989) (internal quotations omitted)). As discussed above, the undisputed facts demonstrate that Kent and Horodecki's jobs were not comparable in terms of their work duties, their continuity of service, their job titles, and their obligation to report to

the Commissioner and Deputy Commissioner.[5] Kent has failed to establish a *prima facie* case under the EPA; therefore, the City is entitled to summary judgment on Kent's EPA claim.

<u>City's Affirmative Defense to Kent's EPA Claim</u>

Summary judgment should be granted in favor of City because Kent has not established a *prima facie* case of a violation of the EPA. However, even if Kent had established a *prima facie* case, the City is entitled to summary judgment because it has established a statutory defense. If a plaintiff can establish a *prima facie* case, "the burden of persuasion shifts to the employer to prove that the disparity is justified by one of four affirmative defenses: (1) a merit system; (2) a seniority system; (3) a system which measures earnings by quantity or quality of production; and (4) a differential based on

---

[5] Even if the Court were to consider Bradley as a comparator, the outcome does not change. As discussed above, Kent has not pointed to evidence that Bradley was paid different wages than she to establish the first prong of her *prima facie* case. Kent also has not established that she and Bradley performed equal work. Kent does not dispute that before Bradley assumed hearing officer duties, his duties included: "supervising the summer youth program; handling special projects by the Commissioner, such as planning and organizing the Department's resources and manpower for City events, parades, marathons, and other public events; setting up and then supervising the City-wide Street Sweeping Aides program; being on-call at all times during the City's snow program that lasts from approximately December 1 through April 1 and includes being one of the Department's supervisors on the street to ensure that the snow is cleared from the streets and sidewalks; handling day-to-day complaints called in by citizens, including for garbage or recycling not being picked up or trees that were down; and any other duties or assignments that the Deputy Commissioner of Sanitation assigned him." (Pl.s' 56.1(b)(3) ¶ 58.) When Bradley assumed hearing officer duties (because of Kent's departure), Kent does not dispute that Bradley continued to perform his additional duties, noted above. Therefore, as in her Horodecki comparison, Kent has not pointed to any evidence to demonstrate that Bradley and she performed equal work.

any factor other than sex." *Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1004-1005 (7th Cir. 2000) (citing 29 U.S.C. § 206(d)(1)).

The City argues that the fourth affirmative defense applies to Kent's claim because any differences in pay were based on the City's Salary Resolution, not gender. (Def.'s Br. at 9.)  Kent argues that because she, Horodecki, and Bradley performed the same job duties, the City's salary resolution "consists of little more than declaring that job titles held by Horodecki and Bradley entitled them to a higher salary."  (Pl.'s Resp. at 7.)

The case law makes clear, however, that as long as each pay discrepancy is explained by some factor other than sex, the City is entitled to summary judgment. *See, e.g., Fallon v. Illinois*, 882 F.2d 1206, 1208–09 (7th Cir.1989) (factor other than sex need not be related to the job duties, or even be business-related, as long as it is bona fide) (*Fallon*).  The Seventh Circuit does not require that the factor other than sex be related to the requirements of the particular position in question, or that it be a "business-related reason[ ]." *Id.*  Instead, the court only asks whether the factor is discriminatorily applied or if it causes a discriminatory effect.  Here, *Lindale v. Tokheim Corp*, 145 F.3d 953, 957 (7th Cir. 1998), is on point.  There, the court held:

> Even if the man and woman are doing the same work for different pay, if the difference is due to a factor unrelated to gender, there is no violation. Consider a female assistant professor and a male full professor in the same department, doing the same amount of teaching and publishing — and perhaps the assistant professor is doing more of both, and doing it better. Yet she will almost certainly be paid less, because of her lower rank.  The difference in sex would not make the difference in pay violate the Equal Pay Act.

Given the undisputed facts, the City has met its burden of proving that the differences in pay were due to the City's title designation and Salary Resolution, not sex. The City employs two different types of positions: "special rate" and "graded." Special-rate positions, which correspond to senior management positions, do not follow the City's Salary Resolution, while graded positions do. Horodecki was hired by the City in 1976 and worked until 1987; he was then re-hired by the City in 1993. From 1993 to 1998, Horodecki held the title of Deputy Director, which is a special-rate position. In 1998, he was promoted to his most recent title of Projects Administrator, a special-rate position. Further, pursuant to the Department's policy, because Horodecki's previous salary as a Deputy Director was higher than the budgeted rate for the Projects Administrator position, Horodecki received a five percent raise above his Deputy Director salary. Therefore, Horodecki's salary is higher than Kent's because he was hired as a special-rate employee and was then promoted to another special-rate position, and then he also received a promotion pursuant to the Department's policy.

If the Court were to consider Bradley as a comparator, he was hired by the City in 1977, and, in 1997, he was promoted to his most recent title of Assistant General Superintendent, which was a Schedule B, Grade 17 position. Bradley was placed at a higher pay step grade within Grade 17 based on his 20 years of continuous service to the City. By contrast, in 2000, Kent was hired by the City as a Staff Assistant, which was a Schedule B, Grade 13 position. In her tenure at the City, Kent received step increases within her pay grade. Importantly, none of the three individuals — Kent, Horodecki, or

Bradley — received a promotion when they assumed hearing officer duties because "hearing officer" is not a titled or budgeted position.

Based on the foregoing undisputed facts, the City has demonstrated that any salary differences among Kent and Horodecki or Bradley were attributable to job title, continuity of service, and the designation or grade into which each of them was hired or promoted. *See Lindale*, 145 F.3d at 957. The Court must accept the City's sex-neutral defense unless the policy was not used or applied in good faith, *i.e.,* it was not bona fide, it was discriminatorily applied, or it had a discriminatory effect. *See Fallon*, 882 F.2d at 1211. Kent argues that the fact that she was not promoted to Grade 15 following her desk audit or designated as a "special-rate" employee demonstrates that the City's pay schedule is "utterly arbitrary and capricious and without any predictability and reliability." (Pl.'s Resp. at 10.) Apart from Kent's unsupported, conclusory assertions, there is no evidence that the City engaged in discriminatory application of its pay schedules. There is also no evidence that had Kent been a male Staff Assistant performing hearing officer duties, she would have received higher pay. *See Lindale*, 145 F.3d at 957. By establishing that the pay disparities are based on factors other than sex, the City has met its affirmative burden under the Equal Pay Act and thus is entitled to summary judgment on Kent's Equal Pay Act claim.

### Counts II and III (Title VII Claims)

A Title VII plaintiff may proceed either under the direct method, by presenting evidence of discriminatory intent, or the indirect, burden-shifting method. *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1029 (7th Cir. 2003). Proceeding

under the indirect method, a plaintiff must establish a *prima facie* case by showing: (1) membership in a protected class; (2) performance meeting the employer's legitimate expectations; (3) an adverse employment action; and (4) similarly situated employees outside of the protected class who were treated more favorably. *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007.) Kent brings claims for gender (Count II) and race discrimination (Count III) and proceeds under the indirect method of establishing a *prima facie* case.

The parties do not dispute that Kent is a member of a protected class or that her performance as a City employee met her employer's legitimate expectations. But the parties do dispute whether Kent has established the third and fourth factors of her *prima facie* case. Kent argues that she has established that she and Horodecki are "similarly situated employees," for the purposes of establishing her *prima facie* case. Neither party has cited a case that defines the standard for who constitutes a "similarly situated" employee. The City sets forth case law that would require Kent to establish that she was similarly situated to a co-employee in almost every respect. Kent is correct that the City's quotation of *Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009), is inapposite because that case involved disparate discipline. *See Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) (noting certain standard applies in "disciplinary cases."). Likewise, the City's quotation of *Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006), is unpersuasive as the language quoted by the City was in the context of the court's discouraging plaintiffs from cherry-picking comparators, which is not at issue here.

"The similarly situated inquiry is a flexible, common-sense comparison based on 'substantial similarity' rather than a strict 'one-to-one mapping between employees,' but still requires 'enough common features between the individuals to allow [for] a meaningful comparison.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008), (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)). A meaningful comparison is one which serves "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Id.* (citation omitted).

As discussed above, with respect to Kent's EPA claim, Kent has not provided any evidence, apart from her self-serving affidavit, that she and Horodecki (or Bradley) held substantially similar roles. Kent only offers her own, slanted characterization of her work duties as compared to Horodecki's and Bradley's but does not offer any evidence to support what is merely her opinion. As discussed above, her only evidence — her affidavit — flies in the face of her own deposition testimony, as well as the undisputed facts. "Without a similarly situated employee, Plaintiffs cannot present a *prima facie* case and [her] claim must fail." *Antonetti*, 563 F.3d at 592; *see also Lenoir v. Roll Coater Inc.*, 13 F.3d 1130, 1132 (7th Cir. 1994) (stating that a plaintiff must demonstrate all four prongs to establish a *prima facie* inference of discrimination). Kent cannot establish the fourth factor of her *prima facie* case; therefore, her Title VII claims for race and sex discrimination fail. The City is entitled to summary judgment on Kent's Title VII claim.

Even if Kent could establish a *prima facie* case, her wage discrimination claim would face an insurmountable obstacle because she cannot show that the City's proffered justification for the wage differences was a pretext for discrimination. Under the Title VII burden-shifting test, if Kent had satisfied her burden of establishing a *prima facie* case, the City then has the burden to articulate a legitimate, nondiscriminatory reason for its decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (*McDonell*). Then, to survive summary judgment, Kent must "establish that there is an issue of material fact as to whether the [City's] proffered reasons are merely pretext for unlawful discrimination or retaliation." *McDonnell*, 411 U.S. at 804. Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a "lie, specifically a phony reason for some action." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (citation omitted). If a reasonable fact finder would be compelled to believe the City's explanation, then the City is entitled to summary judgment. *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005) (*Culver*).

The City argues that its Salary Resolution and designation of position as special rate versus graded account for the differences in pay. As discussed above at length, the City has demonstrated a legitimate, nondiscriminatory reason for the wage differences. Kent has failed to cast doubt on the City's explanation. Kent argues, without any evidentiary support, that after an audit recommended a higher grade (with a salary increase), the "City ultimately did nothing to remedy the [g]rade disparity." (Pl.'s Resp. at 14.) Kent's conclusory, unsupported assertions are not sufficient to demonstrate pretext. Kent further argues that that the City relied on a "reason-less, arbitrary,

25

capricious system for assigning [g]rades and job titles to employees." (*Id.*) But in assessing a plaintiff's claim that an employer's explanation is pretextual, the court does not sit as a "'super personnel review board' that second-guesses an employer's facially legitimate business decisions." *Culver*, 416 F.3d at 547 (internal citation omitted). Rather, the court asks only whether the employer's explanation was "honestly believed." *Culver*, 416 F.3d at 540 ("An employer's explanation can be 'foolish or trivial or even baseless' so long as it 'honestly believed' the proffered reasons for the adverse employment action." (quoting *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir.1997)). Kent has offered no evidence that the City's salary schedules were motivated by race or sex discrimination. Because the City has given *bona fide* reasons why Horodecki and Bradley received a larger salary than Kent, it is entitled to summary judgment as to Kent's claim.

## CONCLUSION

For the reasons discussed above, the City of Chicago's Motion for Summary Judgment [52, 59] is granted in its entirety.

Date: May 4, 2011

_____
JOHN W. DARRAH
United States District Court Judge

26